MARYLAND CASUALTY CO. v. MORUA et al.

No. 2610.

Court of Civil Appeals of Texas. Waco.

April 27, 1944.

Rehearing Denied May 18, 1944.

Smith, Smith & Boyd, of Beaumont, for appellant.

J. W. O'Neal, of Port Arthur, and W. T. McNeill, of Beaumont, for appellees.

RICE, Chief Justice.

This is a workmen's compensation case. Herminie Valdez Morua, joined by her husband, and Esther Valdez, a minor, brought this suit for death benefits because of the death of their father, Alfredo R. Valdez, who, they alleged, died of heat exhaustion at The Texas Company's plant in Port Arthur, Texas, on June 12, 1942. Based on the findings of the jury, judgment was rendered for plaintiffs, and defendant has appealed.

By its first group of points appellant takes the position that there is no admissible evidence of probative force in this record raising the issue that heat exhaustion caused the death of Alfredo R. Valdez, and therefore the trial court committed reversible error in overruling its motion for an instructed verdict, and in submitting the cause to the jury.

It is without dispute that deceased, an employee of The Texas Company, while in the discharge of the duties of his employ-ment, became suddenly and violently ill shortly after 11 o'clock P. M., on the night of June 11, 1942, and died the same night a few minutes after midnight.

In reviewing the evidence introduced on the trial of this cause, as is our duty under the foregoing assignment of error, to determine whether or not the record before us contains any admissible evidence of probative force raising the pleaded controverted issue that the death of Valdez was occasioned by heat exhaustion, we are guided by certain well-established rules of law.

When the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, the question of fact thus raised should be submitted to the jury; it is only when the evidence is harmonious and consistent, and the circumstances permit but of one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised "if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff." Wininger v. Fort Worth & D. C. R. Co., 105 Tex. 56, 143 S.W. 1150; Texas & P. R. Co. v. Cox, 145 U.S. 593, 12 S.Ct. 905, 36 L.Ed. 829; Brown v. Griffin, 71 Tex. 654, 9 S.W. 546; Texas & P. R. Co. v. Ball, 96 Tex. 622, 75 S.W. 4. If an issue of fact is raised by the evidence, it must go to the jury even though a verdict based on such evidence would have to be set aside as not supported by sufficient evidence. Wallace v. Southern Cotton-Oil Co., 91 Tex. 18, 40 S.W. 399.

When the probative force of the evidence is so slight that it raises only a "mere surmise or suspicion of the existence of the fact sought to be established", it is in legal contemplation no evidence at all, and it is the duty of the trial court to direct a verdict. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059.

Viewing the evidence bearing on the cause of the death of Valdez most favorably from the standpoint of plaintiffs, we are of the opinion that the jury could have concluded that the following facts were established:

Valdez, a Mexican fifty-two years of age, had been an employee of The Texas Company about seventeen years, and at

the time of his death was working in the pre-heating department of the refinery of said company near Port Arthur, Texas. The refinery covered an area approximately one mile square. The cracking installations in the pre-heating department cover a space of about ten acres. Each of such installations is a unit, known as a battery, built to withstand high pressure and temperatures of 1400 degrees to 1500 degrees Fahrenheit. Each unit is composed of a heater and of tubes, both highly insulated on the outside. The lines conveying the oil from the heaters to the stills, as well as the stills, are also highly insulated. Most of the pipe lines in the battery are not insulated, and the heat radiates from these lines. All of that territory is full of artificial heat from the fires in the stills and pre-heaters. From the tool-house down to and including battery 38, the batteries are rather close together, and it is hotter in that vicinity than outside. On a summer night the heat from a battery can be felt in walking by on the cement walk. The stills are built six feet from the ground and heat the ground directly underneath and for a distance of five or six feet away. The employees sometimes boil their coffee on the exposed hot lines.

It rained during the morning and early afternoon of June 11th, and the sun shone continuously from 3 P. M. until night. The day was hot and steaming; and it was hot at midnight.

The weather observer made his observations at Port Arthur on top of the post-office about two miles from the refinery. He testified that on the night in question the temperature at 11 P. M. and midnight was 79 degrees; the humidity rose from 71 degrees at 7:15 P. M. to 92 degrees at 1:15 A. M. June 12th. One hundred degrees is saturation. It was in evidence that in determining the effect of climate on a person two elements are considered: (1) thermometer reading; and (2) humidity.

Deceased left the home of his daughter, with whom he resided, at 10:30 P. M. on the night of June 11th, apparently in good health. He had not been sick, and did not complain of feeling bad. In going to and from work it was his custom to ride his bicycle, and he did so on the night of his death. His shift started work at 11 P. M. and he reported for work on time. The deceased was a straw boss or foreman; when it was required he did physical work, otherwise he acted as foreman.

On reporting for work, deceased and another were ordered to move some tools on a tractor from the toolhouse to battery 38. It took them ten or fifteen minutes to load the tools, weighing from ten to thirty pounds each, on the tractor, and, since it was very warm, they perspired. When deceased began loading the tools he appeared to be feeling well, but after loading them he held his stomach and said he felt a pain. They then proceeded to battery 38, about three blocks away, with deceased driving the tractor, and stopped it within about five feet of the battery. They then proceeded to unload the tools. In performing the work they were working as fast as they could, and finished the unloading within eight or ten minutes. The area in which they were working was hot although battery 38 had been shut down. During the time deceased was engaged in this work he at first perspired a little, and later so much that all his clothes were wet; his face was not normal but was pale; he said he was warm all over; that he seemed to be burning inside, and that his chest, back and shoulders hurt. After unloading the tools deceased sat by the heater four or five minutes, said he was very sick and then drove the tractor toward the tool-house; he got half way and could not proceed further; he said he was very ill and could not handle the tractor any longer. He then walked toward the tool-house; he had his arms folded on his shoulders and walked stooped over; when deceased reached the tool-house he leaned against it, with his hands on his shoulders, he was pale, said he felt very bad, that his chest, back and shoulders were hurting very much and that he was burning up. The foreman came and took deceased on the tractor to the first-aid station.

The attendant at the first-aid station testified that deceased stated to him that he thought he had indigestion, that he had eaten a sandwich about eleven o'clock; at deceased's request he gave him soda and aspirin, and he died within fifteen minutes after taking this medicine. He further testified that deceased said nothing to him about the heat nor about being cold, but did say he was burning inside. Deceased did not appear to be chilly, nor did he notice any cold sweat on his body, but he was "kind of red".

The foreman testified that after deceased loaded the tools he next saw him about 11:45 at battery 74 (which was not in operation) after the tools had been unloaded at battery 38; deceased seemed to be in some misery; he next saw deceased at the toolhouse sitting down, leaning over to his left and holding his shoulders, perspiring profusely. Deceased said he had a burning sensation in his shoulders, the back of his shoulders, his chest and left arm—that the pain was inside. Deceased then said he would go to battery 74 for his bicycle and walked out of the door; witness saw him a minute later sitting on the runway at the toolhouse in the same position he had first seen him; witness then insisted on deceased going to the first-aid station; deceased thereupon got on the tractor, and sat there leaning forward to the left; he walked into the first-aid station, said he felt "some better" but that he was freezing on the back of his shoulders, he was cold. Witness could tell he had a cold sweat on him. Deceased told this witness that he had eaten, about 11 o'clock, a tortilla made of meat, beans, and egg, and lots of green pepper. A doctor, called by plaintiffs, in answer to a hypothetical question, testified that assuming the material facts in evidence to be true, they could be calculated to produce heat stroke or heat exhaustion; that these terms are used interchangeably; that it was possible that deceased was the subject of heat prostration; that the fact that deceased said when he finished unloading the tools that he was burning up inside could indicate a case of heat exhaustion.

The two medical experts who took the stand for defendant testified, from the facts in evidence, that in their opinion the death of deceased was due to a coronary occlusion, and that neither the work nor the heat to which he was exposed had any relation to his death. One of these experts had seen deceased shortly after his death, the other had not. The expert who had not seen deceased after his death, while positive in his statement as to his opinion, based on the evidence, that heart trouble caused deceased's death, testified on cross-examination that a man who had eaten a heavy meal would be more apt to have a condition of heat exhaustion; that a cold and clammy skin, without much perspiration, and with the patient feeling cold and chilly, together with cramping in the abdo-

men and arms especially, and the legs, would be some of the sypmtoms of heat exhaustion; that these symtoms vary in different individuals.

■ Without expressing an opinion as to the sufficiency of the evidence, we are of the opinion that the testimony summarized above raised the pleaded issue that the death of deceased was occasioned by heat exhaustion.

By its next group of points appellant says that the trial court committed reversible error in refusing to grant its motion for new trial based on material misconduct of the jury.

At the hearing on appellant's motion for new trial, the jurors who tried the case were placed on the witness stand and interrogated as to matters which transpired during their deliberations. The effect of the evidence so developed was that several of the jurors were refinery workers who had worked around stills of the type described by the witnesses at the trial; and that some of the jurors discussed, and made statements in reference to, matters of their personal knowledge and views, based on their experiences around stills; that in reference to the testimony of appellant's witnesses developed on the trial to the effect that at the point where the deceased unloaded the tools and in the area in which he was working it was very little, if any, warmer than the general atmosphere around the refinery or in Port Arthur, some of the jurors, during their deliberations, expressed their opinion, based on their own personal knowledge of conditions around stills, that this testimony was incorrect. One of the jurors testified that while the jury was discussing the veracity of certain witnesses, a juror stated in reference to the testimony of the zone supervisor (a witness for the appellant) that he could not be fooled, that he had run and operated these stills and that the witness was lying about that. This juror also testified to a statement made in the jury room to the effect that "us working men had to stick together;" and that when he (the juror testifying) said, "We are going too far on that, brothers, sticking together that way, we can't do it that way," this developed "hostility and glaring eyes;" another juror testified that several of the jurors said they knew how hot a still was from having worked around them; "They didn't say how hot it was, they let it be known that it was hot

around them"; another juror gave testimony to the same effect.

After the jurors had testified, the trial court filed findings of fact, in brief, to the effect that a majority of the jurors who sat in this cause were refinery workers employed in the refineries of the county and that as such they were acquainted with the operation of stills similar to the one involved in this cause; that during the deliberations of the jury there was considerable discussion of the personal experience of the jurors and their knowledge of just such conditions as they were faced with in the trial of this cause; that part of such discussion was had before and part after the issues were answered; that in no instance did any juror testify that he was influenced by such discussions or that they in any manner affected the answers he gave to the issues submitted; that the juror Kutcher testified that at least two of the jurors expressed their personal knowledge of such surroundings as they were faced with in this cause, but he did not state he was influenced thereby in answering any of the submitted issues; that said named juror testified he was not satisfied with the verdict that he rendered, and felt that justice had not been done, but that the court found that all of said juror's testimony was an attempt on his part to impeach his verdict, and because all of his evidence was an effort to impeach his verdict, the court did not consider same. Based on these findings the court concluded:

"Conclusion of Law.

"I conclude as a matter of law that the court could not consider the testimony of any juror to impeach his own verdict, and that, excluding such testimony, there is no evidence as a matter of law showing misconduct on the part of any juror in the trial of the above entitled and numbered cause."

Appellant duly objected to the foregoing findings and conclusion and requested further and amended findings. These objections, exceptions and requests were by the court overruled.

In our opinion, the evidence developed on the hearing had on the motion for new trial, and the findings of fact made at the conclusion of the hearing by the trial court, conclusively demonstrate that the jurors who tried this case were guilty of misconduct, in that they received in their retirement material testimony other than from the witness stand in open court; and it reasonably appears to us from the evidence on the hearing of the motion for new trial, the findings of fact made by the trial court, and from the evidence as a whole, that injury probably resulted to the appellant; and, for this reason, a new trial should have been granted. Rule 327, Vernon's Texas Rules of Civil Procedure.

 One of the controlling issues of fact was as to whether a high temperature prevailed in the immediate area in which deceased was working at, and just prior to, the time of his fatal seizure. Appellant's witnesses testified that the stills in the plant were scientifically designed and were highly insulated for the purpose and had the effect of retaining the extremely high degree of operating heat inside the batteries, and that the atmosphere was not appreciably warmer around the stills than at other places in the plant, or in the city of Port Arthur, where no stills were located. The effect of the unsworn testimony of the jurors, given in the secrecy of their retirement, and during the time that they were deliberating, was to impeach these witnesses for appellant. It is the settled law of this state that jurors may not receive during their deliberations other testimony than that adduced during the trial from the witness stand in open court. It is likewise the rule that the fact that jurors have received such other testimony during their deliberations may be shown by the jurors themselves even though the effect of such testimony be to vitiate, or in a broad sense "to impeach", the verdict. Moore v. Ivey, Tex.Com.App., 277 S.W. 106; Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462; City of Houston v. Quinones, Tex.Sup., 177 S.W.2d 259. The fact that the jurors testified that their verdict was not influenced by their misconduct may not be considered by the court in passing upon the question of probable injury. Sproles Motor Freight Lines v. Long, 140 Tex. 494, 168 S.W.2d 642; Texas Milk Products Company v. Birtcher, 138 Tex. 178, 157 S.W.2d 633; Republic Ins. Co. v. Hale, 128 Tex. 616, 99 S.W.2d 909; Barrington v. Duncan, supra.

 It is the rule that misconduct of the jury having been established, the question of probable injury becomes one of law for the courts, and in considering this question the courts will examine the entire record in the case. This record shows that the controlling issue as to the

cause of deceased's death was sharply contested; the evidence introduced by plaintiffs in reference thereto was somewhat speculative. The question of the amount of heat produced by appellant's stills in the immediate area in which they were being operated was of controlling importance; and this unsworn testimony received by the jurors was in reference to this controlling factual situation. We have carefully considered the entire record in this cause, and we conclude therefrom that the misconduct of the jurors was calculated to injure, and probably did injure, appellant. City of Houston v. Quinones, Tex.Sup., 177 S. W.2d 259.

The judgment of the trial court is accordingly reversed, and the cause is remanded for a new trial.